## R. V. Riley v. Willis A. Ogden.   Appeal of Frank Richards.

*Sheriff's interpleader—Bond—Execution.*

The execution and delivery of an interpleader bond does not discharge the goods levied upon from the lien of the execution, or substitute the bond for the goods, but merely operates as a transfer of the goods from the custody of the sheriff to that of the claimant pending the issue as to their ownership.

The giving of an interpleader bond does not prevent the issuing of a second execution and a sale thereon, the fund produced to be paid primarily to the first execution creditor, if he be successful, in the interpleader suit.

After a sheriff's interpleader bond had been filed, the sheriff, instead of delivering the property to the claimant in the interpleader, held it under executions in his hands against him. He subsequently advertised and sold the property at public sale, all parties either requesting the sale or acquiescing in it. The sheriff's auctioneer distinctly announced at the sale that the purchasers would have to pay cash, and that the money would have to be turned into court. The interpleader proceedings resulted in favor of the original execution creditor. *Held*, that the original execution creditor, not the execution creditor of the claimant, was entitled to the fund.

Argued April 4, 1898.   Appeal, No. 24, Jan. T., 1898, by Frank Richards, from order of C. P. No. 4, Phila. Co., Sept. T., 1894, No. 385, dismissing exceptions to auditor's report.   Before STERRETT, C. J., GREEN, McCOLLUM, MITCHELL and DEAN, JJ.   Affirmed.

Exceptions to report of auditor.

The facts appear by the report of the auditor, E. A. Anderson, Esq., which was as follows :

On February 24, 1896, Edward W. Magill entered a judgment against William H. Clark in the court of common pleas No. 1, December term, 1895, No. 1,368, upon a judgment note dated February 23, 1896, for $1,314.50, payable on demand, with interest, and on the same day issued an execution under which the sheriff levied upon and took possession of two horses known as " Peter Cooper " and " Eddie H." as the property of said William H. Clark.   These horses were at that time in the

possession of Willis A. Ogden, and on March 4, 1896, Willis A. Ogden made a claim for these horses and the sheriff obtained a rule for an interpleader, which on March 7, 1896, was made absolute by the court, and on the same day William B. Werntz became surety for the said Willis A. Ogden. This feigned issue was tried, and a verdict in favor of Magill was rendered on April 5, 1897, and judgment entered thereon.

On March 2, 1896, R. V. Riley, a judgment creditor of Willis A. Ogden, his judgment being in C. P. No. 4, September term, 1894, No. 385, for the sum of $466.50, with interest from September 24, 1894, issued an execution against the said Willis A. Ogden, and on March 5, 1896, Frank Richards, who had a judgment for $209.27, with interest from May 12, 1892, against the said Willis A. Ogden, issued his execution against him. On           , 1896, William Werntz filed a claim for these horses, and a rule was taken by the sheriff for an interpleader; depositions were taken under this rule, and the court refused to grant the interpleader. It appeared that Ogden, in order to get these horses out of the reach of his creditors, attempted by means of a bill of sale to Werntz to evade the levy upon the horses. He took Werntz's check, which he did not use and afterwards handed back to Werntz. The court decided it was not a bona fide sale, discharged the rule for an interpleader, and the auditor finds that this claim was aided and abetted by the said Willis A. Ogden for the purpose of removing these horses beyond the reach of the execution creditors.

Execution and attachments were subsequently issued against the said Willis A. Ogden as follows:

Upon the giving of the forthcoming bond by Werntz as bondsman for Ogden, the sheriff, instead of delivering the property to Ogden, immediately levied upon it as the property of Ogden, that is he having possession of it and having in his hands the writs against Ogden refused to deliver it to him and subsequently sold it at the Tattersall, an auction room in the city of Philadelphia for the sale of horses, making the following return to the writ:

"Levied, March 2, 1896, upon certain personal property—to wit: one horse known as 'Peter Cooper' and one horse known as 'Eddie H.' at 1341 Cuthbert street, as the property of the within named defendant. Which property under and by vir-

tue of a certain writ of fieri facias, issued out of C. P. No. 1, December term, 1895, No. 1,368, I had previously levied upon as the property of William H. Clark and under which said writ the said property was claimed by Willis A. Ogden, and a rule of interpleader thereon taken and made absolute and narr and bond filed and feigned issue ordered by the court, which is still pending and undetermined. And under the within writ, the said property was claimed by William Werntz, whereupon a rule of interpleader was taken and discharged by the court after hearing March 28, 1896, and afterwards, to wit: April 3, 1896, I sold the said property so levied upon at the said Tattersall 2056 Market street for the sum of $1,386.72 which money, I have as within commanded.

"So answers

"SAML. M. CLEMENT,
" Sheriff.
" W. F. WILKINS,
"Deputy sheriff."

The price was a full and fair one, and upon its being paid, the horses were delivered to the purchasers and taken away by them. The sheriff paid the money into court, and it was referred to the auditor for distribution.

As a matter of fact, the horses were sold as follows : "Eddie H." for the price or sum of $600, and "Peter Cooper" for the price or sum of $1,175, making a total of $1,775. The difference between the amount of the bid and the amount paid into court represents the sheriff's expense attendant on the keep of the horses, auctioneer's commissions, etc.

### CONCLUSIONS OF LAW.

The proper determination of this question has given the auditor much difficulty, as the points raised by the able arguments of the counsel who appeared before him were to a certain extent entirely new, and none of the authorities cited seems to be on all fours with this case. There appeared before him counsel for Mr. Magill, the execution creditor of Clark, the original defendant, who claimed, first, that distribution should not be made of this fund pending the determination of the interpleader granted in his execution, and after that had been

decided in his favor, that the fund should be awarded to him on the ground that pending the interpleader the horses were in custodia legis, his lien still existed, and that they having been sold and possession given by the sheriff the fund arising therefrom stood in the place and stead of the horses and should be awarded to him. Counsel representing the various execution creditors of Willis A. Ogden, the claimant under the original execution, claimed the fund on the ground that the sheriff's sale was only of the interest of Ogden in these horses; that the giving of the bond had taken the horses out of the grasp of the sheriff under Magill's execution; that the sale was subject to the result of the interpleader suit; that the purchaser bought but Ogden's title, and the horses were still subject to the lien of Magill's writ, who could pursue his execution and sell them as though this sale had not been made, and that the fund having been raised on the sale of the Ogden title, Clark's creditors had no interest in it and were not entitled to participate in its distribution. Counsel who appeared for Ogden claimed that $300 should be awarded to his client under the exemption law. Counsel for Frank Ogden claimed the sum of $140 as wages for the keep of these horses while in the possession of Willis A. Ogden. The sheriff was also represented by counsel, as was the bondsman in the interpleader bond. They were present to look after the interests of their respective clients, and to see they were not jeopardized in their absence.

The auditor is of the opinion that the claim of Willis A. Ogden for his exemption of $300 out of this fund should be rejected. Outside of the fact that Mr. Ogden has been decided not to be the owner of these horses, the further fact has been shown by the evidence that he by means of an attempted sale sought to get them out of the reach of his creditors and so defeat the levy of the execution upon them; and that has been held sufficient to defeat his claim for exemption: Frank v. Kurtz, 4 Pa. Superior Ct. 233; Strouse v. Becker, 38 Pa. 190; Kreider's Est., 135 Pa. 578.

The claim of Frank Ogden should also be rejected. The act of 1891, under which it is made, requires certain formalities to be observed, that is, a notice shall be given to the sheriff before the sale, stating the character of the service, and that the same was rendered in and about the business carried on, that the

labor was done within six (6) months, the process must be sufficiently set out and described and that the claimant must set forth that his claim is a lien on the property levied upon: Hall's Estate, Lachman's Appeal, 148 Pa. 121.  These notices should be such as would indicate to the officer and those interested, the sum due before the sale, the limit of time as to work done, the business defined by the acts and the property subject to the lien: Allison v. Johnson, 92 Pa. 316; Adamson's Appeal, 110 · Pa. 462; Timmes v. Metz, 156 Pa. 384.  While the evidence of Frank Ogden shows that he did give some notice to the sheriff, that notice has not been produced, nor have its contents been shown, the auditor is, therefore, unable to say that these formalities were complied with and the claim must therefore be rejected.

This brings us to the main contention in the case which was as to the right of the execution creditor of Clark to participate in the distribution of the fund.   If he could do so, he being the first execution creditor, and his judgment being for more than the amount to be distributed, he would be entitled to the whole of it.   As was said before, none of the cases cited, nor any to which the auditor has been able to refer, seems to be exactly on fours with this case, but there are cases both in this state and others which bear upon the question raised here.   It seems to be settled beyond controversy that the effect of the interpleader bond was that it simply gave possession of the horses into the hands of the claimant, Ogden, but that the lien of the levy still remained: Bain v. Lyle, 68 Pa. 60; Byrne v. Hayden, 124 Pa. 170.   Justice Sterrett saying in the latter case: " It has been repeatedly held that the execution and delivery of such bond does not discharge the goods from the lien of the execution, or substitute the bond for the goods, it merely operates as a transfer of the goods from the custody of the sheriff to that of the claimant, pending the issue as to their ownership."   It also seems clear that at a sheriff's sale the rule of caveat emptor applies, and the purchaser takes the title of the defendant in the execution: Bain v. Lyle, supra; Wells v. Van Dyke, 106 Pa. 111.   And it has been held that the fact of an execution and the giving of an interpleader bond does not prevent the issuing of a second execution and a sale thereon, the fund produced to be paid primarily to the first execution creditor if he

be successful in the interpleader suit : Battersby v. Haubert, 8 W. N. C. 94.    Justice MITCHELL, then a judge in the court of common pleas of this county, said " the inconvenience of a contrary rule is patent.    A dishonest debtor would only have to get a friendly or nominal creditor to make a levy, and a collusive friend to make a claim, and then other creditors might safely be held at bay during the years of waiting for a jury trial, which both parties to the issue would unite in postponing. Other creditors have rights and must have an opportunity to enforce them, and the most regular and convenient, if not the only way, is by allowing them to acquire a standing as junior execution creditors, to call upon the man in front to push on, or stand aside for those who will."    And although this decision has been criticised by the annotator in Hagan v. Lucas, 10 Peters (U. S.), 400, Brightly's notes, as being unsound, the auditor is not only bound to accept it, but is convinced that it is both wise and sound.    The facts there, however, differ from the case in hand in this, that both the executions in that case were issued against the same defendant, whereas in this case the second set of executions are issued against a different person, the claimant.    And just here comes the pinch of this case. It would seem, as in Bain v. Lyle, supra, was actually done, that if the lien of the levy still remained, and the execution creditor still had his right to pursue the horses and the purchaser bought only what title the defendant in the writ had, as was the case in Wells v. Van Dyke, supra, then the execution against Clark would be unaffected by this sale and the execution creditor would have no interest in this fund ; and if the law was logic, the auditor would unhesitatingly arrive at that conclusion ; but as he understands it the law is not administered, nor courts of justice instituted to be logical, but to be just, and to decide as nearly as can be that which is right between man and man, settling each class of cases as they arise upon principles which reason and experience show to be just.    We have here an execution creditor who has been diligent in the assertion of his rights, and who has laid his hand upon these horses as being the property of his debtor, and is ready to make his claim of them, but the law, in order that no injustice be done, temporarily stays him that another's right to these goods be tested, and allows the claimant to hold the goods pending the deter-

mination of the interpleader, he giving a bond to return them if the issue is settled as against him. The bond is given and the goods are to be taken away from the possession of the sheriff who holds them under the execution, but the sheriff holds them under a second execution against the claimant, and, after notifying all the parties in interest, proceeds to sell them under the second execution, and does so for a full price, giving possession of the property to the purchaser. Now, it will be noticed in the first place that the sale here is not of a title, as in the sale of real estate, but of the thing itself, and possession and removal follow it; secondly, that the property which the first execution creditor had in his grasp has been taken away from him; thirdly, that the prices paid for the horses were full ones, and that all the parties in interest knew of the sale ; and lastly, the horses had never been delivered to the claimant.

Chief Justice HOLT, quoted in Hagan v. Lucas, supra, has said: " Goods once seized and in the custody of the sheriff cannot be seized again by the same or any other sheriff." That case, however, decides only that goods in the custody of the United States marshal cannot be seized by any sheriff and vice versa. But Battersby v. Haubert, supra, distinctly decides that such an execution could be made subject to the right of the original execution creditor, who would be entitled to priority in the distribution of the fund. It is contended, however, that this only applies to cases where, as there, the executions were levied against the same defendant, but that a different rule must be evoked if the defendants are different, that the rule of caveat emptor must be applied to the purchaser, and the lien of the first execution creditor still subsisting, his remedy is against the horses, or in default of their production then against the bond. If this is the law, then let us see in what position it places the parties. The claimant had no title to the horses ; that has been judicially determined, yet if this contention is correct his creditors are to be paid out of the price paid for the horses, and he himself is here claiming to be paid his exemption of $300 out of it. On the other hand the original execution creditor, whose execution has been held to be good, has that which he had levied upon taken away from him, and he is left to the chance of seeking it again in strange hands. The risk which the law puts upon him was the chance of get-

ting it back from the claimant, but the law itself has taken it away from the claimant and given it to a stranger, and, as it was said by SHARSWOOD, J., in Bain v. Lyle, supra, about goods which claimant might sell: "It is next to impossible for the sheriff or execution creditor to follow the goods in such a case, and in the majority of instances, and in all of that character, he is necessarily thrown upon his bond." But under our decisions the bondsman is not responsible in such cases as this, his bond is given that the claimant will produce the goods if the issue is determined against him, that however the law has made impossible by taking them away from him, or rather in this case by refusing him possession of them. Says Judge SHARSWOOD, in Bain v. Lyle, supra: "The surety on bonds undertakes for the forthcoming of the identical goods, not for their value, except in the case of a breach. If by an act of law the performance of the condition has become impossible upon every principle the bond is saved. Co. Litt. 206 A," and in Sedgwick's Appeal, 7 W. & S. 260, a case under the stay law, where a forthcoming bond was given, and subsequently the property was sold under another execution, and both execution creditors claimed the proceeds, a case in which Judge SHARSWOOD says it is hard to draw a distinction between it and Bain v. Lyle, supra. Justice HUSTON, in deciding in favor of the original execution creditor, said: "No court can construe a law so as to entirely and totally defeat its operation. If any other creditor could take the property as soon as the bond was given no man would have given bond to deliver it at the end of the year. Besides, no law would require bail to deliver property at the end of twelve months, and yet allow it to be taken by law in twelve days or less. The bail then would, according to the law of the land, give a conditional bond which, by the law of the land, might become absolute in a week or a day; or if the law offered a delay on giving bail and the law took away the delay, could the law enforce the payment of the bond given by the bail?"

It is clear, from this reasoning, and we must bear in mind that the reasoning in Bain v. Lyle, supra, is that of the greatest master of the law that this commonwealth has produced in half a century, that the bond is saved and the security of the original execution creditor, so far as the bond is concerned, is gone.

We are thus brought to the point that the execution creditor is either to be reimbursed out of the proceeds of the sale, or must take his chance to get the goods back from the purchaser at the sheriff's sale; and in this case a purchaser who has bought in good faith, paid a full price and had the horses delivered to him with the knowledge and acquiescence of all the parties concerned, is entitled in morals and by fair dealing to have the price stand in their place to answer the demand of those entitled to their value.

This is not the risk the law put on Magill when it kept these goods from being sold under his execution; he was to look to the claimant, and the claimant alone, to produce them; he was not to be compelled to hunt for that which had passed out of the hands of the claimant, and especially that which had been taken out of his possession under the wing of the law to the undoing of the men who had honestly paid the value for the horses, and to the enriching of those who had no claim or title thereto, a result shocking to the mind, and only to be justified upon the plea that to decide otherwise would be a clear breach of settled law.

The auditor, however, is clear that this is not the duty of the execution creditor; that he is not compelled to seek these goods, and if lucky enough to find them, drag them from the purchaser, or in default of finding them, go bare; but is of the opinion that the price paid for these horses is a substitute for the horses themselves, and stands in their place to pay those entitled.  His thought is that the goods in the hands of the claimant were still in the custody of the law, and that he held them as a kind of bailee of the sheriff, and a retaking of them by the sheriff discharged that bailment, releasing the bailee and his bondsman, and that any sale of them subsequently by the sheriff by which the custody was passed away, no matter under whose writ, the sale was made, being the sale of the thing itself, and not the title alone, inured to the benefit of all the execution creditors in the order of their priority.  Judge HUSTON, in Sedgwick's Appeal, supra, says "it is during the year in the custody of the law, as much as it were before this act, from the time of the levy during the time which elapsed till the day of the sale, no one supposes that the law was intended to defeat a plaintiff absolutely in recovering his debts, but if the property

is appraised and a bond given, the plaintiff cannot recover from the sheriff, for the law protects him; he could not in these or similar cases recover from the bail, for at the expiration of the year the property was all forthcoming, and if, when it was sold, the proceeds would go to a subsequent execution creditor, the plaintiff in the first execution would lose his debt, unless the debtor had property sold sufficient to pay all his debts."

A case in many features similar to this, that of Sartwell v. Moses, 62 N. H. 355, where the plaintiff claimed certain goods which the defendant, a deputy sheriff, attached as the property of a third person; pending suit, plaintiff agreed that defendant should sell the goods and hold the proceeds instead. It was there held that the plaintiff's right to the money received from the sale of the goods was the same as his previous right to the goods.

The auditor does not attempt to decide what are the rights of the purchaser as between the execution creditor and himself, nor is it necessary for the proper determination of this case. He does find, however, that as between the execution creditors, Magill, as the original execution creditor, is entitled to treat this fund, it having been raised upon the sale of the horses upon which his execution was levied, as though the horses had never been out of the hands of the sheriff upon his levy, but had been sold by virtue of it, and as the fund is not sufficient to pay his debt in full, he therefore awards to him the balance in court, after paying the costs and expenses of this audit.

Exceptions to the auditor's report were dismissed by the court, ARNOLD, P. J., filing the following opinion :

The sheriff's return states that he levied upon two horses under two writs of execution, one against William H. Clark and the other against Willis A. Ogden. Against Magill's execution Ogden claimed to be the owner of the horses, and an issue was awarded to determine the ownership of them. That issue has been tried and determined in favor of Magill. The deputy sheriff testified that at the request of all parties claiming ownership of the horses, he sold them at the Tattersall, a place where the highest price was most likely to be got, and the result justified the agreement and choice of the parties. The sale was of the horses and not of an interest in them or subject

to a prior levy. Had there been a doubtful or incumbered title offered, the horses would not have fetched a full price. The auditor was right in awarding the proceeds to the first execution, and his report is confirmed.

*Errors assigned* were in dismissing exceptions to auditor's report.

*A. Lewis Smith*, with him *Alfred J. Wilkinson*, for appellant. —If there is anything settled in law it is that the validity of the title of the defendant has nothing to do with giving direction to the proceeds of sale under fi. fa. If my property is levied on and sold for a fair price under an execution against another, and the goods be delivered to the purchaser, it will not be pretended that I am entitled to the fund. The plaintiff in the execution takes that. I may either retake my property, if I can find it, or sue the sheriff, or do both, but cannot get the proceeds of sale, for my title has not been changed. A fortiori, this is the case where there is a mere lien, as here, on a title which has not been sold. Suppose Clark had, after the sale, paid Magill's judgment, or Magill had realized it from other sources, could he (Clark) have claimed the fund? Certainly not. It must go to the executions which produced it: McCelland v. Slingluff, 7 W. & S. 134; Hutchman's App., 27 Pa. 209; Reily's App., 36 Leg. Int. 413; Wilkinson's App., 65 Pa. 189; Bush, Bunn & Co.'s App., 65 Pa. 363.

The familiar case of the sale of land conveyed in fraud of creditors (where the grantee is practically a trustee for the grantor) shows that even as to real estate, and against the same defendant, the law divides the title, so that a sale after the conveyance will not divest liens entered before: Byrod's App., 31 Pa. 241; Fisher's App., 33 Pa. 294.

The principle established by the old district court of Philadelphia and affirmed in Bain v. Lyle, 68 Pa. 60, was a necessary corollary of the law as above set forth. The contention of the appellant rests upon the law as definitely settled in that case, and it has been regarded as the law of this commonwealth for more than a quarter of a century: Davis v. Fouche, 38 Leg. Int. 186.

As to any supposed hardship to the surety, by taking the

goods on another execution, the cases of Taylor v. Bonaffon, 17 W. N. C. 425, and Collins v. Schlichter, 11 Phila. 349, should be a sufficient answer.

The mistake made by Magill was in acquiescing in the sale, instead of applying to court to stop it, in accordance with the practice laid down in Ware v. Deacon, 7 Pa. 368.

*Alex. Simpson, Jr.*, with him *Francis Shunk Brown*, for appellee.—Magill's levy was first, and the lien thereof was not divested by the interpleader bond given by Ogden : Bain v. Lyle, 68 Pa. 60; Reid v. Lindsey, 104 Pa. 156 ; Kightlinger's App., 101 Pa. 540.

The levies of Riley and Richards were subject to Magill's : Battersby v. Haubert, 8 W. N. C. 94.

PER CURIAM, April 18, 1898 :

There appears to be no substantial error in the learned auditor's findings of fact; and, upon the material facts thus established, the residue of the fund in court, after deducting costs and expenses, was rightly awarded to Magill, the original execution creditor. While the evidence may not warrant the conclusion that all the parties in interest actually requested the sheriff to sell the horses and pay into court the proceeds, for distribution, etc., it is very evident, from what occurred at the time of the sale that they knew this was to be done, and at least tacitly acquiesced therein. The sheriff's auctioneer distinctly announced, at the sale, " that the purchasers would have to pay cash for the horses, . . . . the money would have to be turned into court."

Decree affirmed and appeal dismissed at appellant's costs.